UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

WILLIAM HOWARD WARD,

Plaintiff,

v.

COUNTY OF SAN DIEGO, et al.,

Defendants.

Case No.: 23CV1819 BJC (BLM)

**REPORT AND RECOMMENDATION FOR AN ORDER DENYING DEFENDANTS' MOTION TO DISMISS**

**[ECF No. 29]**

This Report and Recommendation is submitted to United States District Judge Benjamin J. Cheeks pursuant to 28 U.S.C. § 636(b) and Civil Local Rules 72.1(c) and 72.3(f) of the United States District Court for the Southern District of California.  For the following reasons, the Court **RECOMMENDS** that Defendants' motion to dismiss be **DENIED**.

### PROCEDURAL BACKGROUND

On October 2, 2023, William Howard Ward ("Plaintiff" or "Ward") filed a Complaint ("Compl.") alleging violations of his constitutional rights pursuant to 42 U.S.C. § 1983, violation of the Bane Civil Rights Act, negligence, and intentional infliction of emotional distress against Defendants County of San Diego ("County"), Acting Sheriff Kelly Martinez in her official capacity, and Does 1-50.  ECF No. 1.   On November 29, 2023, Plaintiff filed a First Amended Complaint

("FAC") naming the County of San Diego and Acting Sheriff Anthony Ray in his official capacity, and Does 1-50.  ECF No. 7.  On February 8, 2024, Plaintiff voluntarily dismissed Anthony Ray.  ECF No. 18.  The County moved to dismiss Plaintiff's FAC for failing to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  ECF 15.  Plaintiff filed an Opposition but also requested leave to file an amended complaint.  ECF No. 19.  On March 26, 2024, United States District Judge Roger Benitez did not reach the merits of the County's Rule 12(b)(6) motion and instead, permitted Plaintiff leave to file an amended complaint pursuant to Federal Rule of Civil Procedure 15(a)(2).  ECF No. 22.  On April 11, 2024, Plaintiff filed a Second Amended Complaint ("SAC") against the County, Stephen Yi, Emiliza Cornejo, Carina Echon, Ozioma Enworom, Classification Does 1 and 8, Deputy Does 2, 5, 6, 9, and 10, Medical Supervisor Doe 3, Medical Doe 4, and Deputy Supervisor Does 7 and 1.  ECF No. 23.

On May 31, 2024, Defendants County, Echon, and Yi filed a Motion to Dismiss ("MTD") Plaintiff's SAC pursuant to Federal Rule of Civil Procedure 12(b)(6).  ECF No. 29.  Plaintiff filed an Opposition ("Opp'n.") to which Defendants filed their Reply.  ECF Nos. 34, 35.  On August 15, 2024, Defendants Cornejo and Enworom filed an Answer to Plaintiff's SAC.  None of the Doe Defendants have appeared in the action to date.

On December 9, 2024, United States District Judge Linda Lopez referred the matter to this Court.

## **FACTUAL ALLEGATIONS**

In September of 2022, Plaintiff experienced an onset of acute psychosis.  SAC at 11.  He had auditory and visual hallucinations and believed he was being followed.  Id.  He left his apartment in San Diego, and lost contact with his family and friends.  Id.  Plaintiff's parents, who lived out of state, were concerned he had stopped taking his medication and contacted the City of San Diego 911 line, along with the San Diego Police Department ("SDPD"), and the City's Psychiatric Emergency Response Team ("PERT").  Id.

On September 4, 2022, Plaintiff was experiencing an auditory and visual hallucination which caused him to believe a person at the beach was in danger.  Id.  This led to a brief altercation with a lifeguard which caused Plaintiff to be arrested after being evaluated by a

23CV1819 BJC (BLM)

paramedic and placed on a "5150" hold.  Id. at 11-12. At the SDPD Northern Substation he was interviewed by a SDPD detective and Plaintiff "shared details from his paranoia, including his belief that people were trying to break into his apartment."  Id. at 12. The detective stopped the interview due to "Ward's statements not making any sense."  Id.  SDPD officers transported Plaintiff to Scripps Memorial Hospital in La Jolla for treatment of minor injuries and then booked him into the San Diego Central Jail ("SDCJ").  Id.

After Plaintiff waited three hours in a holding cell, Plaintiff was "medically screened" by Defendant Stephen Yi ("Yi"), a "registered nurse in the Central Jail Medical Services Division responsible for conducting medical and mental health screening for new inmates in Central Jail." Id.  Plaintiff was showing signs of psychosis, including speaking incoherently, "displayed memory loss, heightened paranoia, and disassociation."  Id.  He also had an open laceration on his forehead.  Id.  Yi failed to document these wounds in violation of policy and merely noted that Plaintiff had been "treated for his wounds."  Id.  Yi referred Plaintiff to the medical sick call clinic for the laceration.  Id. at 14. Yi did not conduct a mental health screening or make any notes of Plaintiff's mental condition.  Id.  Yi included a note for "further assessment by QMPH [Qualified Mental Health Professional]."  Id.  However, County policy allowed a QMPH up to thirty days to evaluate a psychiatric patient.  Id.

Yi and Defendant Classification Doe 1, a "classification officer in Central Jail, placed Plaintiff in the Enhanced Observation Housing ("EOH") but did not put him in a psychiatric or medical unit despite his "obvious and urgent psychosis."  Id. While in the EOH, policy required Plaintiff to be checked on every fifteen minutes and the cell consisted of a room "no bigger than a janitor's closet" and had only a small window.  Id.  Defendant Deputy Doe 2 brought Plaintiff to that cell and although he could see that Plaintiff was suffering from a "severe psychosis," he would not allow Plaintiff to make a phone call which was a violation of San Diego County Sheriff Department ("SDCSD") policy.  Id at 15.

In the meantime, Plaintiff's parents had been trying to locate him and after repeatedly calling various law enforcement agencies, a "missing persons bulletin was issued" for Plaintiff on September 4, 2022.  Id.  Later that evening, Yi was alerted that Plaintiff was a missing

person.  Id.  Yi then called Plaintiff's parents who informed Yi of Plaintiff's mental illness and his need for medication.  Id.  They also provided Yi with Plaintiff's medical records and the contact information for his treating psychiatrist in order to follow up with the psychiatrist for medication recommendations.  Id.  His parents informed Yi that they were concerned that if he did not receive his medication immediately Plaintiff would suffer even more severe psychosis.  Id.  Yi did not review Plaintiff's medical records nor did he call Plaintiff's treating psychiatrist.  Id. at 16.  Yi also did not update Plaintiff's jail medical records to reflect any of the information given by Plaintiff's parents.  Id.  Yi did not update Classification Doe 1 about Plaintiff's medical needs or contact his supervisor Defendant Medical Supervisor Doe 3 to reassess Plaintiff's housing assignment. Id.

From September 4, 2022 to September 9, 2022, Plaintiff was not visited by any nurses or given any medication but was instead left naked in his cell, with no blanket, and not given any water to drink.  Id.  As a result, he "became dehydrated and severely ill with pneumonia, bacteremia, and a lung infection." Id.  Plaintiff claims he "contracted the haemophiles influenzae bacteria ("H. influenzae")" which resulted in flu like symptoms including "fever, chest pain, coughing, and difficulty breathing." Id. at 13.

Yi, Medical Supervisor Doe 3, Medical Doe 4, Defendant Nurse Practitioner Emiliza Cornejo[1] ("Cornejo"), and Defendant Registered Nurse Carina Echon ("Echon")  were required to conduct assessments on Plaintiff "every twenty-four (24) hours while he was in EOH per SDSD [Medical Services Division ("MSD")] policy." Id. at 17.  They failed to conduct any assessment for four days, September 5, 6, 7, and 8.  Id.  They did not visit Plaintiff nor did they make any entries into his medical records during that timeframe.  Id.  They also failed to order Plaintiff's prescriptions or contact his treating psychiatrist.  Id. at 18. However, when Plaintiff's parents called the Central Jail on September 5th, they were informed that Plaintiff was being treated by medical staff and Defendant Medical Doe 4 confirmed they had received his outside medical records and prescriptions from the parents.  Id. at 17. Medical Doe 4 did not document the call

---

[1] Cornejo has filed an Answer to Plaintiff's SAC.  See ECF No. 37.

in Plaintiff's records nor did any Defendant reach out to Plaintiff's parents after September 5th. Id.  In addition, Yi, Medical Supervisor Doe 3, Medical Doe 4, Cornejo, and Echon deliberately failed to notify Psychiatrist Janet Medenwald-Hogg, M.D., the QMHP contracted with the San Diego Sheriff's Department to provide psychiatric evaluations, of Plaintiff's immediate psychiatric needs.  Id.

Deputy Does 2, 5, and 6 were all "custodial officers/Deputies" who were responsible for "checking on" Plaintiff.  Id. at 18.  They viewed his cell from the window of his cell door but never entered his cell to provide clothing, blankets, or give him "adequate food and water."  Id. They did observe Plaintiff was "agitated, speaking incoherently, and physically ailing."  Id.  They also observed he was "ill, lethargic, coughing, having trouble breathing," as well as "moaning in pain."  Id.  However, they did not inform Yi, Classification Doe 1, Medical Supervisor Doe 3, Medical Doe 4, or their supervisor  Deputy Supervisor Doe 7 of Plaintiff's deteriorating condition or "summon immediate medical care."  Id.

On September 9th, five days after Yi had requested a medical examination for Plaintiff, Cornejo conducted a medical examination on Plaintiff for his "head laceration above his left eye and knee scrape."  Id. at 19. Cornejo did not enter the cell to examine Plaintiff and observed his condition from outside his cell.  Id.  She reported that Plaintiff was "lying in bed" and noted "NAD" which is an acronym for "no abnormality detected."  Id.  Both Cornejo and Deputy Doe observed that Plaintiff was laying on his bed and his "breathing was shallow."  Id.

As a result of the lack of medical care, Plaintiff "developed sepsis due to the pneumonia and H. influenzae."  Id. at 20.  He was suffering from "acute respiratory failure," limited oxygen supply, and became "severely ill, feverish, and aspirated on his own vomit."  Id.  He also suffered from a pulmonary embolism and "developed metabolic encephalopathy – delirium and loss of consciousness due to toxicity and lack of oxygen to his brain."  Id.

Plaintiff then suffered a seizure which resulted in "bilateral posterior shoulder dislocation" which is a "rare occasion where both shoulders are dislocated toward the back of the body" which is "almost always the result of seizures."  Id.  Plaintiff had no history of seizures.  Id. Plaintiff had the seizure either before Defendants visited his cell on September 9 or immediately

23CV1819 BJC (BLM)

1    after Cornejo and Deputy Doe came to his cell. Id.

2        On the afternoon of September 10, Echon found Plaintiff unresponsive on the floor of his

3    cell.  Id.  He was "exhibiting seizure-like symptoms, foaming at the mouth, and was

4    unresponsive." Id. Echon checked his vital signs, found them to be abnormal, and Plaintiff was

5    transported to UC San Diego Hospital ("UCSD") and admitted into the "Surgical Intensive Care

6    Unit ("SICU") around 2:30 p.m." Id.  Plaintiff was paralyzed on his left side, bleeding was found

7    in the left side of his brain, and he had two additional seizures while at UCSD.  Id. at 21.

8        While at UCSD, Plaintiff was diagnosed with "complete posterior shoulder dislocation" and

9    a "reverse Hills-Sachs lesion (bone fracture)" which was treated with a "closed shoulder

10   reduction" on September 14. Id. On September 15, a UCSD psychiatrist diagnosed Plaintiff with

11   "schizoaffective disorder and prescribed medication." Id.  It was later discovered his right

12   shoulder was also dislocated and they performed a second "closed shoulder reduction." Id.  The

13   doctors ordered arm slings for Plaintiff due to his increased risk for further dislocations and

14   noted he would need shoulder reconstruction surgery in the future. Id.  UCSD updated the

15   Central Jail of Plaintiff's diagnoses and treatments.  Id.

16       On September 20, Plaintiff was transported to Tri-City Medical Center where he stayed

17   until September 27 to "complete IV antibiotics." Id.  While he was at Tri-City he was handcuffed

18   to his bed and SDSD custodial officers were in his room at all times.  Id.  Plaintiff was discharged

19   back to Central Jail on September 27 to be housed in a "Medical Observation Bed ("MOB")." Id.

20   at 22.  The Central Jail medical staff were aware of Plaintiff's physical limitations which included

21   "dislocated shoulders, slings, limited Range of Motion ("ROM"), shoulder pain, weakness,

22   inability to get up from the floor by himself, continued infection and need for antibiotics,

23   psychiatric diagnosis, medical and psychiatric prescriptions, and the recommended follow-up

24   care." Id.

25       Plaintiff was assigned a cell with two cellmates and "given the top (third) bunk." Id.

26   However, he could not climb up to his bed due to his arms being in slings, "so he had the

27   mattress moved down to the floor and slept there, instead." Id.  Because Plaintiff was unable

28   to raise his arms, his cellmates "helped him dress." Id.  It was not until September 28 that

Plaintiff was evaluated by a QMHP for the first time.  Id.  The QMHP spoke with Plaintiff's attorney who informed him of Plaintiff's mental health needs and prescriptions again.  Id.

Plaintiff was not given a medical wrist band and as a result, he would not receive his medication when medical staff "made their rounds" dispensing medication.  Id.  Because of the lack of medication, Plaintiff "experienced increased blood pressure, insomnia, worsened shoulder pain, and declining mental health."  Id.  When he asked for his medication, Plaintiff was ignored by medical staff.  Id.  Two days later he was finally given a medical wrist band. Id.

On September 30, Plaintiff was "punched in the face and chest by his cellmate."  Id. at 23.  After reporting this incident, Plaintiff was removed from his cell and transferred to the George Bailey Detention Facility ("GBDF").  Id.  Defendant Nurse Practitioner Ozioma Enworom[2] ("Enworom") conducted a "sparse" medical screening of Plaintiff and wrote "inadequate" notes." Id.  Enworom did not refer Plaintiff to the medical or psychiatric units despite his "obvious medical needs" and "documented psychiatric needs."  Id.  Enworom did not conduct a mental health screening on Plaintiff.  Id.

Enworom and Classification Doe 8, a GBDF classification officer, knew Plaintiff had been assaulted by a cellmate and was at risk for further attacks.  Id.  They also knew of both Plaintiff's psychiatric and medical needs.  Id.  Regardless, they assigned Plaintiff to be housed with "violent inmates" instead of housing him in a medical or psychiatric unit.  Id.

Deputy  Doe 9 brought Plaintiff to a "general population dorm-style 'pod'" where he was "again assigned a top-level bunk."  Id.  Plaintiff told Deputy Doe 9 that he could not climb up to the top bunk with his arms in slings and he was told to "lay his mattress on the floor."  Id. Deputy Doe "greenlighted" Plaintiff by "signaling to inmate gang members that they could beat" Plaintiff.  Id. at 24.  This was done by Deputy Doe 9 purposefully bringing Plaintiff in front of these inmates with his "MOB" wristband, making eye contact with the inmates, and "nodd[ing] his head to the gang members – indicating that they had permission to beat [Plaintiff]."  Id. Deputy Doe 9 and Deputy Doe 10 also informed these inmates of the Plaintiff's alleged crime,

---

[2] Enworom has filed an Answer to Plaintiff's SAC.  See ECF No. 37.

1    the altercation at the beach, knowing that they would "want to beat [Plaintiff] for his alleged

2    crime." Id.  These deputies told the inmates that they were permitted to beat Plaintiff and they

3    would not intervene.  Id.

4         After the deputies left, one of the inmates "slapped [Plaintiff] across the face, knocking

5    him to the ground." Id.  Several inmates then took Plaintiff into the showers, "backed him in a

6    corner," "punched him in the jaw several times and then smashed his head into the wall." Id.

7    Plaintiff suffered a fractured "left mandible" and a "laceration to his right forehead." Id.  Plaintiff

8    believes Deputy Does 9 and 10 "watched" or "deliberately failed to surveil" and "deliberately did

9    not intervene in the beating." Id.  "After the beating, Deputies gathered [Plaintiff] from the

10   showers" and his "slings were soaked with blood," discarded and not replaced. Id. at 25.  Deputy

11   Doe 10 told Plaintiff "next time you're at the beach, keep your hands to yourself." Id.

12        Plaintiff was taken to Alvarado Hospital where he received stitches for his laceration.  Id.

13   On October 1, Plaintiff was transferred to Scripps Mercy Hospital where he was diagnosed with

14   a fractured left jaw and a "closed reduction" was performed on his mandible.  Id.  Plaintiff's jaw

15   was "banded shut, requiring immobility for three (3) weeks." Id.  He was discharged from this

16   hospital on October 5 and a hospital psychiatrist "ordered [Plaintiff] discharged to the jail

17   psychiatric inpatient unit *only* due to [Plaintiff's] declining mental health, admitted suicidality,

18   and risk of further physical harm from inmates." Id.

19        Plaintiff returns to the Central Jail where he is screened by a psychiatrist.  Id.  The

20   psychiatrist recommends placement in the EOH, as well as "prompt psychiatric follow-up and

21   screening . . . prior to release." Id. at 25-26.  However, a Classification Deputy never placed

22   him in the EOH and Plaintiff never received a psychiatric screening prior to his release from the

23   Central Jail. Id. at 26.  Instead, he was placed in a MOB.  Id.  He was still in pain and could not

24   dress without the assistance of his cellmates.  Id.  Plaintiff repeatedly had to ask for dental wax

25   to protect his gums from the metal implanted in his mouth to wire his jaw shut but he was given

26   only "small bits of dried wax." Id.  Plaintiff was also directed to use a "waterpik" style flosser as

27   his only means to clean his mouth three times a day but was only allowed to use one "sparingly"

28   after filing a number of grievances.  Id.

The hospital prescribed a liquid diet for Plaintiff which included "Ensure nutrition shakes three (3) times per day for proper caloric intake" but the medical staff only provided "gelatin cups and milk for his meals – nutritionally insufficient for his size and needs." Id.  Plaintiff became malnourished and had to file grievances to receive Ensure shakes. Id.  He did not receive the prescribed three shakes per day and on one occasion, the deputies split one shake among several inmates. Id. at 27.  As a result of the deficient nutrition, Plaintiff lost twenty pounds in six weeks. Id.  In addition, medical staff failed to give Plaintiff his pain medication as prescribed and were inconsistent when they did provide him the medication. Id.  Medical staff ignored Plaintiff when he asked for his medication causing him to go more than twelve hours without pain medication causing him to suffer pain and lose sleep. Id.  While he notified medical staff of the pain in his shoulders, they never gave him slings to wear. Id. at 27-28.

After Plaintiff requested x-rays of his shoulders, Deputies brought him to a holding cell where he was left for six hours with no food or water before x-rays were taken on October 10. Id. at 28.  Plaintiff believes that he was kept in the holding cell for six hours in retaliation for filing grievances and requesting medical care. Id.  Plaintiff never received the results of the x-rays that were taken and he received no follow up medical care for his shoulder pain. Id.  Deputy "Jones" told Plaintiff in front of his  cellmates "[w]e know you know there's nothing wrong with your shoulders." Id.

Plaintiff's criminal defense attorney advocated for his conditional release to a psychiatric facility on October 17, 2022. Id.  While at the psychiatric facility, Plaintiff was "given all of his medications, a proper diet, and he felt physically and mentally safe." Id.  The medical doctors at the facility also diagnosed Plaintiff with "infectious ulcers in his mouth and prescribed antibiotics." Id. at 29.  When Plaintiff completed his "court-ordered psychiatric stay on December 9," he was "released straight into surgery to reconstruct his shoulders." Id.

## **MOTION TO DISMISS**

### **A.  Legal Standard**

Under Federal Rule of Civil Procedure 12(b)(6), a party may file a motion to dismiss on the grounds that a complaint "fail[s] to state a claim upon which relief can be granted." A motion

23CV1819 BJC (BLM)

to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim." Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001); Bryan v. City of Carlsbad, 207 F. Supp. 3d 1107, 1114 (S.D. Cal. Mar. 20, 2018).

Because Rule 12(b)(6) focuses on the "sufficiency" of a claim rather than the claim's substantive merits, "a court may [ordinarily] look only at the face of the complaint to decide a motion to dismiss," Van Buskirk v. Cable News Network, Inc., 284 F.3d 977, 980 (9th Cir. 2002), including the exhibits attached to it. See Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc., 896 F.2d 1542, 1555 n.19 (9th Cir. 1990) (citing Amfac Mortg. Corp. v. Ariz. Mall of Tempe, Inc., 583 F.2d 426 (9th Cir. 1978) ("[M]aterial which is properly submitted as part of the complaint may be considered" in ruling on a Rule 12(b)(6) motion to dismiss.)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)); Villa v. Maricopa Cnty., 865 F.3d 1224, 1228-29 (9th Cir. 2017). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. Plausibility requires pleading facts, as opposed to conclusory allegations or the "formulaic recitation of the elements of a cause of action," Twombly, 550 U.S. at 555, which rise above the mere conceivability or possibility of unlawful conduct. Iqbal, 556 U.S. at 678-79; Somers v. Apple, Inc., 729 F.3d 953, 959-60 (9th Cir. 2013). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. While a pleading "does not require 'detailed factual allegations,'" Rule 8 nevertheless "demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555).

Therefore, "[f]actual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. "Where a complaint pleads facts that are merely

consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Iqbal, 556 U.S. at 678 (citation and quotes omitted).

### B.    Request for Judicial Notice

Defendants seek judicial notice of the claim filed by Plaintiff with the County of San Diego on February 27, 2023 and the San Diego County Sheriff's Department Medical Services Division Operations Manual, Section E.5.1, dated November 4, 2022 regarding "Mental Health Screen and Evaluation."    ECF No. 29-2. Under the Federal Rules of Evidence, judicial notice is appropriate when a fact is not subject to reasonable dispute because it is either generally known within the trial court's territorial jurisdiction or can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Plaintiff does not object to Defendants' request, nor does there appear to be a "reasonable dispute" as to the accuracy of these records.  Accordingly, Defendants' request for judicial notice is granted.

### C.    Doe Defendants

Defendants move to dismiss the "doe" defendants in this matter and argue that the Plaintiff's use of Doe pleadings is improper "especially where a plaintiff alleges constitutional violations under Section 1983."  MTD at 14 (citing Keavney v. Cty. of San Diego, 2020 WL 4192286, at *4-5 (S.D. Cal. July 21, 2020)).  Defendants assert that in actions brought pursuant to Section 1983, the Plaintiff must "allege specific facts showing how each particular doe defendant violated his rights." Id.  Here, Defendants claim that Plaintiff's SAC lacks specific facts linking individual Doe defendants to the alleged constitutional violations, arguing that "group pleading" or "collective pleading" of defendants' wrongdoing is not permitted with regard to both state and federal law claims brought in federal court.  Id. at 15 (citing Shine v. Fuston, 2021 WL 4460885, at *5 (S.D. Cal. Sept. 29, 2021)).

In response, Plaintiff argues that he has properly set forth factual allegations against the Doe defendants with the required specificity.  Opp'n at 14.  Plaintiff asserts that throughout the SAC there are specific allegations about individual doe defendants and the specific actions they took that allegedly violated Plaintiff's constitutional rights.  Plaintiff maintains that the SAC "gives the DOE Defendant employees 'fair notice of what Plaintiff's claims are and their grounds.'"  Id.

at 15 (citing <u>Lomeli v. Cnty of San Diego</u>, 627 F.Supp.3d 1046, 1056 (S.D. Cal. 2007) ("[T]he complaint [must] 'give the defendant fair notice of what the … claim is and the grounds upon which it rests.'").

Generally, the use of Doe pleading is disfavored. <u>Gillespie v. Civiletti</u>, 629 F.2d 637, 642 (9th Cir. 1980). However, the Ninth Circuit has established that when the identity of alleged defendants is unknown at the time of filing a complaint, plaintiffs should be given an opportunity through discovery to identify these unknown defendants, unless it is clear that discovery would not uncover the identities or that the complaint would be dismissed on other grounds. <u>Wakefield v. Thompson</u>, 177 F.3d 1160, 1163 (9th Cir. 1999) (citing <u>Gillespie</u>, 629 F.2d at 642); <u>Estate of Osuna v. County of Stanislaus</u>, 392 F.Supp.3d 1162, 1169 (E.D. Cal. June 25, 2019).

Defendants rely on a case in which a court in this District dismissed Doe defendants due to the lack of specific identification and the absence of a reasonable expectation that would reveal their identities. <u>Thomas v. Cty. of San Diego</u>, 2021 WL 2715086, at* 3 (S.D. Cal. July 1, 2021). In <u>Thomas</u>, the district court found that the plaintiff had named twenty unknown defendants as "Does" and the amended complaint "vaguely claims that all twenty Doe Defendants acted negligently." <u>Id</u>. Therefore, the district court dismissed these defendants because the plaintiff did "not link any particular negligent act to any specific individual actor." <u>Id</u>.

In this case, however, Plaintiff has identified the Doe defendants with specificity, i.e. Classification Does 1 and 8, Deputy Does, Medical Supervisor Does 3, 7, and 11, and alleged actions taken by them, along with the dates on which these actions allegedly took place. <u>See generally</u> SAC. Plaintiff has provided sufficient detail to allow for the reasonable identification of the Doe defendants and the Court finds that discovery is likely to reveal the identities of these Doe defendants. Moreover, "defendants do not contend that discovery will not uncover the identities of the Doe defendants." <u>Estate of Osuna</u>, 392 F.Supp.3d at 1169. Accordingly, the Court recommends that Defendants' motion to dismiss the Doe defendants be DENIED.

/ / /

/ / /

23CV1819 BJC (BLM)

### D. First Cause of Action Fourteenth Amendment Deliberate Indifference to Medical Needs/Conditions of Confinement pursuant to 42 U.S.C. § 1983

Defendants argue that Plaintiff has failed to plead facts sufficient to support his first cause of action which is a claim for deliberate indifference to Plaintiff's medical needs under the Fourteenth Amendment.  MTD at 16.  "[C]laims for violations of the right to adequate medical care 'brought by pretrial detainees against individual defendants under the Fourteenth Amendment' must be evaluated under an objective deliberate indifference standard." Gordon v. Cty. of Orange, 888 F.3d 1118, 1125 (9th Cir. 2018) (quoting Castro v. County of Los Angeles, 833 F.3d 1060, 1070 (9th Cir. 2016)). Therefore, "the plaintiff must 'prove more than negligence but less than subjective intent - something akin to reckless disregard.'" Id.  In addition, "[j]ail officials have a duty to ensure that detainees are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety."  Shorter v. Baca, 895 F.3d 1176, 1185 (9th Cir. 2018).

Under Gordon, in order to state a Fourteenth Amendment deliberate indifference to a serious medical need claim, a pre-trial detainee such as Plaintiff must allege facts sufficient to show that:

> (i) [each] defendant made an intentional decision with respect to the conditions under which [he] was confined; (ii) those conditions put [him] at substantial risk of suffering   serious harm; (iii) [each] defendant did not take reasonable available measures to abate that   risk,  even  though  a  reasonable  official  in  the circumstances would have appreciated   the high degree of risk involved—making the consequences of the defendant's conduct   obvious; and (iv) by not taking such measures, [each] defendant caused [his] injuries.

Gordon, 888 F.3d at 1125.

Defendants Yi and Echon[3] argue Plaintiff "asserts various unsupported theories in which individual defendants are clumped together in an attempt to support his claim for deliberate

---

[3] The motion currently before the Court was brought only on behalf of the County of San Diego, Defendant Yi, and Defendant Echon.  The other named Defendants have not moved to dismiss the claims against them.

indifference" and the "twenty theories" listed in his SAC "do not amount to the strict deliberate indifference standard."   MTD at 17.   Defendants also claim Plaintiff's SAC merely contains "buzzwords and legal conclusions." Id.

The Court disagrees. Plaintiff's SAC sets forth a number of specific and plausible factual allegations with regard to Defendants Yi and Echon which adequately state a claim for deliberate indifference to his serious medical and mental health care needs.   Plaintiff alleges that both Defendants made intentional decisions regarding his medical care, mental health care, and the conditions of his confinement.   For example, Plaintiff alleges Yi failed to properly treat him when he first arrived at the Central Jail and did not conduct a mental health screening despite Plaintiff's apparent mental health crisis. SAC at 13.  Both Yi and Echon are alleged to have been required to conduct nursing assessments on Plaintiff every twenty-four hours by jail policy but failed to provide Plaintiff any medical attention for four days.  Id. at 17. Yi allegedly did not enter any information into Plaintiff's jail medical records regarding his mental health condition.  Id. at 13. Yi, along with another named Defendant, placed Plaintiff in the EOH rather than a psychiatric unit which, pursuant to the County's policy, allowed for Plaintiff to potentially wait up to thirty (30) days before being seen by a qualified mental health professional ("QMHP").  Id. at 14.

Plaintiff also alleges that these Defendants failed to take reasonable measures to lessen the risk to Plaintiff's medical and mental health.  Yi had a conversation with Plaintiff's parents in the evening of September 4th where they allegedly informed Yi that Plaintiff had a serious mental illness and needed his medication.  Id. at 15.  Despite allegedly receiving Plaintiff's medical records from his parents and contact information for his treating psychiatrist, Yi did not update Plaintiff's jail medical records with this information or inform any jail medical staff about Plaintiff's urgent mental health needs.  Id.  Yi and Echon also allegedly failed to order Plaintiff's mental health medications which he claims caused him to "suffer from severe psychosis, become gravely ill with pneumonia, and have a seizure." Id. at 32.  Yi and Echon both allegedly failed to "summon medical care in the face of obvious signs that [Plaintiff's] health was deteriorating dangerously" including "disorganized thinking, confusion, altered thought process, nakedness, an unclean cell, coughing, labored breathing, lethargy, and moaning in pain."  Id. at 40.

Defendants' alleged inaction, despite allegations of the deterioration of Plaintiff's medical and mental health, demonstrates a failure to take reasonable measures to abate the risk of harm. Gordon, 888 F.3d at 1125.

Plaintiff also has plausibly alleged that the deterioration of his medical and mental health condition was directly caused by the actions, or inaction, of Defendants. Id. Plaintiff claims that he was housed in a cell, without adequate blankets or clothes, that was "filthy, collecting garbage and biological waste." SAC at 16. As a result of the conditions in this cell, he "became dehydrated and severely ill with "pneumonia, bacteremia, and a lung infection." Id. at 16. Plaintiff seeks to hold Yi and Echon liable because he alleges that they were "responsible for checking" on him and administering his medical care and if they had fulfilled these duties, they would have been aware of the conditions that he was being subjected to and provided necessary care. Id. However, because they allegedly failed in their obligations to monitor Plaintiff, he developed worsening medical conditions arising from the conditions of his confinement. Id.

Based on these factual allegations, Court finds that Plaintiff has plausibly alleged that both Yi and Echon failed to provide adequate mental and medical health care to Plaintiff and were objectively deliberately indifferent to his mental and medical health care needs. Gordon, 888 F.3d at 1125. Accordingly, the Court recommends that Defendant Yi and Echon's motion to dismiss Plaintiff's Fourteenth Amendment deliberate indifference to Plaintiff's mental and medical health needs be DENIED.

**E.      Second Cause of Action Fourteenth Amendment Failure to Protect**

Defendants County, Yi and Echon move to dismiss the Fourteenth Amendment failure to protect claims found in Plaintiff's second cause of action in the SAC. MTD at 18-19. However, this "cause of action is asserted against George Bailey Defendants DEPUTY DOES 9 and 10 and DEPUTY SUPERVISOR DOE 11." SAC at 44. Defendants County, Yi, and Echon are not named in this cause of action. Accordingly, the Court recommends that Defendant County, Yi and Echon's motion to dismiss this claim be denied without prejudice.

/ / /

/ / /

1        **F.    Qualified Immunity**

2        Defendants Yi and Echon argue that they are entitled to qualified immunity because

3   "Plaintiff has failed to plead a constitutional violation under the Fourteenth Amendment" and he

4   will be "hard pressed" to "identify clear precedent concerning the same alleged constitutional

5   violations under circumstances similar to his." MTD at 20-21.

6        "Government officials enjoy qualified immunity from civil damages unless their conduct

7   violates 'clearly established statutory or constitutional rights of which a reasonable person would

8   have known.'" Jeffers v. Gomez, 267 F.3d 895, 910 (9th Cir. 2001) (quoting Harlow v. Fitzgerald,

9   457 U.S. 800, 818 (1982)). When presented with a qualified immunity defense, the central

10  questions for the court are: (1) whether the facts alleged, taken in the light most favorable to

11  Plaintiff, demonstrate that the Defendants conduct violated a statutory or constitutional right;

12  and (2) whether the right at issue was "clearly established" at the time it is alleged to have been

13  violated.  Saucier v. Katz, 533 U.S. 194, 201 (2001). Although Saucier originally required the

14  Court to answer these questions in order, the U.S. Supreme Court has since held that "while the

15  sequence set forth [in Saucier] is often appropriate, it should no longer be regarded as

16  mandatory." Pearson v. Callahan, 555 U.S. 223, 236 (2009).

17       A right is "clearly established" when its contours are "sufficiently clear that a reasonable

18  official would understand that what he is doing violates that right." Id. at 202. "The Supreme

19  Court has 'repeatedly … stressed the importance of resolving immunity questions at the earliest

20  possible stage of litigation." Dunn v. Castro, 621 F.3d 1196, 1199 (9th Cir. 2010) (quoting

21  Hunter v. Bryant, 502 U.S. 224, 227 (1991)).  However, the Ninth Circuit has found that

22  "[d]etermining claims of qualified immunity at the motion-to-dismiss stage raises special

23  problems for legal decision making." Keates v. Koile, 883 F.3d 1228, 1234 (9th Cir. 2018).

24  "When, as here, defendants assert qualified immunity in a motion to dismiss under Rule

25  12(b)(6), dismissal is not appropriate unless we can determine, based on the complaint itself,

26  that qualified immunity applies." O'Brien v. Welty, 818 F.3d 920, 936 (9th Cir. 2016) (citation

27  omitted)).

28  / / /

Here, because the Court has found that the findings set forth above demonstrate that Plaintiff has alleged plausible allegations sufficient to state a Fourteenth Amendment claim, it would be premature and inappropriate for the Court to find that Defendants are entitled to qualified immunity at this stage. "Once an evidentiary record has been developed through discovery, defendants will be free to move for summary judgment based on qualified immunity." Id. Moreover, the Court notes that Defendants attempt to frame the factual allegations in the light most favorable to Defendants when they argue "Plaintiff must identify case law concerning an individual who was medically cleared for booking" and "promptly sent to the hospital for treatment upon suffering illness and/or injury, and yet the medical and/or sworn staff were somehow found to have violated the person's constitutional rights." MTD at 21. This framing of the factual allegations does not accurately present the facts set forth in the SAC. The standard for a motion to dismiss requires the Court to consider the facts in the light most favorable to Plaintiff, not the Defendants, so the Court declines to adopt the Defendants' argument.

Here, Plaintiff's Fourteenth Amendment right to adequate medical care as a pretrial detainee was clearly established at the time of Defendants' actions. See Gordon, 888 F.3d 1118. The Ninth Circuit held that claims for violations of the right to adequate medical care brought by pretrial detainees must be evaluated under an objective deliberate indifference standard. Id. Moreover, in Sandoval v. County of San Diego, the Ninth Circuit denied qualified immunity based on facts similar to those alleged in this action. Sandoval v. County of San Diego, 985 F.3d 657 (9th Cir. 2021). In Sandoval, the Ninth Circuit considered whether under established case law as set forth in Gordon, a reasonable nurse would have understood that "failing to check on the [pretrial detainee] for hours and failing to pass on information about his condition ..., 'presented a substantial risk of harm to [pretrial detainee] that the failure to act was unconstitutional." Id. at 678. The Ninth Circuit held that the Plaintiff "demonstrated that the available law [Gordon] was clearly established as to the reasonableness of the nurses' conduct." Id. Here, both Yi and Echon are alleged to have failed to check on Plaintiff for several days, or at the very least, failed to check on him within a twenty-four hour period which is very similar to the facts in Sandoval, a case decided in 2021 before the facts given rise to this action occurred.

1    The Court recommends that Defendants Yi and Echon's motion to dismiss Plaintiff's SAC
2    on qualified immunity grounds be denied without prejudice.

3    **G.    Monell Liability**

4    Defendant County of San Diego ("County") argues that Plaintiff has failed to sufficiently
5    allege Monell liability against the County.  MTD at 21-23.  To state a claim against the County
6    of San Diego, Plaintiff must demonstrate that: (1) he was deprived of a constitutional right, (2)
7    the County has a policy, custom, or practice which amounted to deliberate indifference to that
8    constitutional right; and (3) the policy, custom, or practice was the moving force behind the
9    constitutional violation.   Dougherty v. City of Covina, 654 F.3d 892, 900–01 (9th Cir. 2011)
10   (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978)). "[A] local government may not
11   be sued under § 1983 for an injury inflicted solely by its employees or agents." Monell, 436 U.S.
12   at 694. Instead, a local government may be sued when an employee who committed a
13   constitutional violation was "acting pursuant to an expressly adopted official policy, longstanding
14   practice or custom, or as a final policymaker." Thomas v. Cnty. of Riverside, 763 F.3d 1167,
15   1170 (9th Cir. 2014) (citing Monell, 436 U.S. at 694).

16   A municipal entity is liable under section 1983 only if Plaintiff alleges his constitutional
17   injury was caused by employees acting pursuant to the municipality's policy or custom. Mt.
18   Healthy City Sch. Dist. Bd. of Ed. v. Doyle, 429 U.S. 274, 280 (1977); Monell, 436 U.S. at 691;
19   Villegas v. Gilroy Garlic Festival Ass'n, 541 F.3d 950, 964 (9th Cir. 2008). The County of San
20   Diego may not be held vicariously liable under section 1983 simply based on allegedly
21   unconstitutional acts of its employees. See Board of Cty. Comm'rs. v. Brown, 520 U.S. 397, 403
22   (1997); Monell, 436 U.S. at 691 ("[A] municipality cannot be held liable solely because it
23   employs a tortfeasor."); Jackson v. Barnes, 749 F.3d 755, 762 (9th Cir. 2014). Instead, the
24   municipality may be held liable "when execution of a government's policy or custom ... inflicts
25   the injury." Monell, 436 U.S. at 694; Los Angeles Cty., Cal. v. Humphries, 562 U.S. 29, 36 (2010).
26   "The 'first inquiry in any case alleging municipal liability under § 1983 is the question whether
27   there is a direct causal link between a municipal policy or custom and the alleged constitutional
28   deprivation.' " Castro v. Cnty. of Los Angeles, 833 F.3d 1060, 1075 (9th Cir. 2016) (en banc)

23CV1819 BJC (BLM)

1    (quoting <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378, 392 (1989)).

2          Defendants argue that Plaintiff has not alleged <u>Monell</u> liability because Plaintiff's claims

3    are based on alleged unconstitutional policies for incarcerated individuals with mental illnesses

4    but his "alleged injuries or damages as described in his SAC have nothing to do with his mental

5    illness or how he was treated for his mental illness" while housed in the SDCJ and GBDF.  MTD

6    at 21.  Plaintiff disagrees and cites to the County Policy, Medical Services Division policy E.5.1,

7    which "allowed a thirty (30) day waiting period for Plaintiff to be evaluated by a psychiatrist" or

8    "qualified medical health professional."  Opp'n at 21.  Plaintiff alleges that this policy allowing

9    such a lengthy waiting period to be treated for his mental illness was the cause of his

10   "deterioration and illness."  <u>Id</u>.  In addition, Plaintiff alleges that the County was well aware of

11   mental health staffing shortages and failed to maintain adequate mental health care staffing

12   levels during his detention.  <u>Id</u>.  Plaintiff also alleges that the County lacked a policy or policies

13   requiring continuity of care and that mental health prescriptions and medications for new

14   detainees be processed appropriately so the required medication and care is provided to the

15   new detainee in a timely manner.  Plaintiff argues that the County's failures in these regards

16   resulted in him not obtaining his medications and other mental health treatment in a timely

17   manner which caused him to be unable to manage his health leading him to "suffer from severe

18   psychosis, become gravely ill with pneumonia, and have a seizure."  SAC at 32.

19         Defendants' argument that Plaintiff is unable to allege that his "incident was anything

20   more than a one-off," is contradicted by Plaintiff's allegations of similar incidents in the SDCJ

21   involving two inmate deaths due to similar neglect allegedly experienced by Plaintiff.  MTD at

22   22, Opp'n at 22.  Plaintiff cites to two other actions involving the death of detainees who

23   allegedly "died from urgent medical issues in Central Jail due to Deputies not checking on them,

24   leaving them alone in unsanitary cells, and medical staff deliberately ignoring their obvious

25   illnesses."  Opp'n at 22 citing SAC at 37.  The Court finds that these allegations plausibly allege

26   that employees acted pursuant to the County's policy, practices, and customs which allegedly

27   gave rise to the constitutional violations alleged by Plaintiff.

28   / / /

Based on the allegations set forth in Plaintiff's SAC, the Court finds that Plaintiff has sufficiently alleged a <u>Monell</u> claim against the County and recommends that Defendants' motion to dismiss this claim be denied.

### H.     Bane Act

Defendants argue that Plaintiff's factual allegations do not support a violation of the Bane Act.  MTD at 23-24.  Defendants contend that Plaintiff has failed to sufficiently allege that any of the named Defendants violated his constitutional rights and he must plead "something *more* than deliberate indifference to his medical needs in order to state a Bane Act claim."  <u>Id</u>. at 23 (emphasis in original).

The Tom Bane Civil Rights Act ("Bane Act"), California Civil Code § 52.1, provides in part:

> (b) If a person or persons, whether or not acting under color of law, interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state, the Attorney General, or any district attorney or city attorney may bring a civil action for injunctive and other appropriate equitable relief in the name of the people of the State of California, in order to protect the peaceable exercise or enjoyment of the right or rights secured.

> (c) Any individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of this state, has been interfered with, or attempted to be interfered with, as described in subdivision (b), may institute and prosecute in their own name and on their own behalf a civil action for damages, including, but not limited to, damages under Section 52, injunctive relief, and other appropriate equitable relief to protect the peaceable exercise or enjoyment of the right or rights secured.

Cal. Civ. Code § 52.1(a)–(c).

As set forth above, the Court has found that Plaintiff has sufficiently alleged that Defendants violated his constitutional rights so Defendants' first argument is not meritorious.  Defendants' second argument is that Plaintiff must allege "something more" than deliberate indifference to state a claim under the Bane Act.  MTD at 23 (citing <u>Cisneros v. Vangilder</u>, 2019

23CV1819 BJC (BLM)

WL 285800, at *7 (N.D. Cal. Jan. 22, 2019) ("In light of <u>Allen</u>, the Court must determine whether Plaintiffs have [sufficiently alleged that] there was coercion independent form the alleged deliberate indifference to Plaintiffs' serious medical needs") (quoting <u>Allen v. City of Sacramento</u>, 234 Cal.App.4th 41, 68 (2015)).  Defendants do not address the Ninth Circuit's decision in <u>Reese v. County of Sacramento</u>, 888 F.3d 1030, 1043 (9th Cir. 2018).

In <u>Reese</u>, the Ninth Circuit held that "the Bane Act does not require the 'threat, intimidation[,] or coercion' element of the claim to be transactionally independent from the constitutional violation alleged' so long as the plaintiff shows the defendant had a "specific intent" to commit the constitutional violation. <u>Id</u>.  As a result, "[m]ultiple district courts have adopted the position that 'a prisoner who successfully proves that prison officials acted or failed to act with deliberate indifference to his medical needs ... adequately states a claim for relief under the Bane Act.' " <u>Galley v. Cnty. of Sacramento</u>, 2023 WL 4534205, at *5–6 (E.D. Cal. July 13, 2023) (quoting <u>M.H. v. Cnty. of Alameda</u>, 90 F. Supp. 3d 889, 899 (N.D. Cal. 2013)); <u>Lapachet v. California Forensic Med. Grp., Inc.</u>, 313 F. Supp. 3d 1183, 1195 (E.D. Cal. 2018) (finding "that threats, coercion and intimidation are inherent in deliberate indifference claims" and that "Plaintiffs bringing Bane Act claims for deliberate indifference to serious medical needs must only allege prison officials knowingly deprived them of a constitutional right or protection through acts that are inherently coercive and threatening, such as housing a prisoner in an inappropriate cell, failing to provide treatment plans or adequate mental health care, and failing to provide sufficient observations.") (quotation omitted).  The Court agrees with the reasoning set forth in <u>Reese</u> and the cited district court cases.

Here, as discussed above, Plaintiff has alleged sufficient facts to state a claim for deliberate indifference to a serious medical need against Defendants County, Yi, and Echon and the Court finds that the same alleged facts are sufficient to state a claim for a Bane Act violation against the three Defendants.  Accordingly, the Court recommends that Defendants' motion to dismiss Plaintiff's claim brought under the Bane Act be DENIED.

/ / /

/ / /

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.    California Government Code Section 845.6

Defendants move to dismiss Plaintiff's claim brought pursuant to California Government Code Section 845.6 which provides in part:

> Neither a public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody; but, …, a public employee, and the public entity where the employee is acting within the scope of his employment, is liable if the employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care.

Cal. Govt. Code § 845.6.

"In order to state a claim under § 845.6, a prisoner must establish three elements: (1) the public employee knew or had reason to know of the need (2) for immediate medical care, and (3) failed to reasonably summon such care." Jett v. Penner, 439 F.3d 1091, 1099 (9th Cir. 2006).   "Liability under section 845.6 is limited to serious and obvious medical conditions requiring immediate care." Watson v. State, 21 Cal.App.4th 836, 26 Cal.Rptr.2d 262, 265 (Ct.App.1993).  The California Court of Appeal clarified that § 845.6 "is very narrowly written to authorize a cause of action against a public entity for its employees' failure to summon immediate medical care only, not for a certain employee's malpractice in providing that care." Castaneda v. Dep't of Corrections and Rehabilitation, 212 Cal.App.4th 1051, 1071 (2013).

Plaintiff argues that because there is a factual dispute over what constitutes "immediate medical care," which cannot considered in deciding a motion to dismiss, the Court should not dismiss this claim.  Opp'n at 24. Castaneda acknowledges that a "public employee's knowledge of the need for immediate health care and the reasonableness of his or her actions in summoning care are factual questions for the jury." Castaneda, 212 Cal.App.4th at 1073.  Defendants argue that when Plaintiff was found unresponsive in his cell, there is no dispute that medical attention was "immediately" summoned.  MTD at 24.  In response, Plaintiff argues that Defendants "ignored Plaintiff's medical needs for nearly a week" and if they had monitored Plaintiff as they were required, they would have summoned medical attention much sooner.  Therefore, according to Plaintiff, the response by Defendants was not "immediate."

23CV1819 BJC (BLM)

When evaluating a motion to dismiss, the Court is required to consider the alleged facts in the light most favorable to Plaintiff.  Interpipe Contracting, Inc. v. Becerra, 898 F.3d 879, 886-87 (9th Cir. 2018) ("We must accept the factual allegations of the complaint as true and construe them in the light most favorable to the plaintiff…").  Doing so here, the Court finds that Plaintiff has adequately alleged facts that could plausibly support a violation of the statute.  Accordingly, the Court recommends that the Defendants' motion to dismiss Plaintiff's claim brought pursuant to Cal. Govt. Code § 845.6 be DENIED.

### J.    Negligence Claim

#### 1.    Medical Negligence and Medical Malpractice

Defendants argue that Plaintiff's sixth cause of action includes "multiple theories, including those related to alleged medical malpractice." MTD at 25.  Defendants move to dismiss Plaintiff's purported medical malpractice claims as these "specific claims are barred" for allegedly failing to comply with the notice requirements of California Code of Civil Procedure § 346(a) and by the one-year statute of limitation of California Code of Civil Procedure § 340.5. Id. at 25-26. In his Opposition, Plaintiff states "[t]o be clear, Plaintiff does not allege any 'medical negligence' or 'medical malpractice' claims in his SAC." Opp'n. at 26.  The Court accepts this representation by Plaintiff that he does not assert any medical negligence or medical malpractice claims in this action and recommends denying Defendants' motion to dismiss these claims as moot.  The Court also recommends that based on Plaintiff's representation, Plaintiff be prohibited from asserting any claims for medical negligence or medical malpractice in this action.

#### 2.    Immunity

Defendants argue that all of the individually named Defendants, and therefore the County as well, are "immune from Plaintiff's claim that they had a duty to investigate Plaintiff's obvious mental illness." MTD at 28 (citing Cal. Govt. Code § 855.8(a)).

Under § 855.8(a), both public entities and public employees are generally immune from liability for injuries resulting from diagnosing or failing to diagnose mental illness or addiction, or from failing to prescribe for mental illness. Cal. Gov. Code § 855.8(a).  However, there are exceptions to this immunity.  Section 855(c) and (d) specify that public employees are not

immune from liability for injuries caused by their negligent or wrongful acts in prescribing or administering treatment for mental illness. As Plaintiff correctly points out in his Opposition, he is not alleging that Defendant "failed to diagnose or prescribe for his mental illness." Opp'n. at 23. Plaintiff alleges that the Defendants were made aware of Plaintiff's pre-existing mental health diagnosis and the need for the medications prescribed by his treating physician and that Defendants were negligent in failing to treat his mental health which is an exception to the immunity provision. Opp'n. at 24.

As previously stated, at the motion to dismiss stage, the Court is required to consider the facts in the light most favorable to the Plaintiff. Interpipe Contracting, Inc., 898 F.3d at 886-87. Here, Plaintiff has alleged that Defendants were provided notice that Plaintiff had a mental health diagnosis, had a treating psychiatrist, had prescriptions for specific medications, and urgently needed to be given the medication. Plaintiff further alleges that Defendants failed to provide the required treatment. As such, Plaintiff has stated facts that negate Defendants' immunity claim and the Court recommends that Defendants' motion to dismiss these claims on immunity grounds be DENIED.

## K.    Negligent Supervision and Training

Defendant County moves to dismiss Plaintiff's seventh cause of action for negligent supervision and training. MTD at 28. The County argues that they can "only be held liable if there is a 'mandatory duty imposed by enactment that is designed to protect against the risk of a particular kind of injury'" pursuant to California Govt. Code § 815.6. Id. They further claim that Plaintiff "has not alleged any such mandatory duty, and this claim as to the County must be dismissed." Id.

In response, Plaintiff argues that he has alleged a mandatory duty by alleging in the SAC that Defendants "had a duty to properly train and supervise their employees to summon immediate medical care for detainees whom they knew, or had reason to know, required medical care, pursuant to Cal. Gov. Code § 845.6." Opp'n. at 25; SAC at 63. Plaintiff contends that "[v]iolation of Cal. Govt. Code § 845.6 by an individual officer supports claims for negligent supervision and training against the County and its supervisor officials." Opp'n. at 25 (citing

<u>Resendiz v. Cty. of Monterey</u>, 2015 WL 3988495, at * 8 (N.D. Cal. June 30, 2025.)  In <u>Resendiz</u>, the court stated that the plaintiff adequately alleged a claim of negligent supervision over the county entity concluding that the plaintiff's claims against the county were "viable under Cal. Gov't Code § 845.6 to the extent [p]laintiffs' claims are based on [d]efendants' alleged negligence in supervising and training their employees regarding the furnishing of medical care." <u>Id.</u>, 2015 WL 3988495, at * 8. Based on Plaintiff's explicit allegations arising from Cal. Gov. Code § 845.6, the Court finds that Plaintiff has adequately alleged a mandatory duty on the part of the County and therefore, has adequately stated a negligent supervision and training claim.  The Court recommends that Defendants' motion to dismiss this claim be DENIED.

## CONCLUSION AND RECOMMENDATION

For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the District Judge issue an Order: (1) approving and adopting this Report and Recommendation; and (2) denying Defendants' motion to dismiss.

**IT IS HEREBY ORDERED** that any written objections to this Report must be filed with the Court and served on all parties **no later than February 11, 2025**.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties **no later than February 18, 2025**.  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  <u>See</u> <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998).

Dated:  1/28/2025

_Barbara L. Major_
Hon. Barbara L. Major
United States Magistrate Judge

23CV1819 BJC (BLM)